## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE CATALANO, on behalf of himself and all others similarly situated,<br><br>                    Plaintiff,<br>        v.<br><br>BMW of NORTH AMERICA, LLC, a New Jersey limited liability company; BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, a corporation organized under the laws of the Federal Republic of Germany; and BMW MANUFACTURING CO., LLC, a Delaware limited liability company.<br><br>                    Defendants. | Case No. 1:15-cv-04889<br><br>**CORRECTED FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff George Catalano ("Plaintiff") brings this class action on behalf of himself and all similarly situated individuals against Defendants BMW of North America, LLC ("BMW NA"), Bayerische Motoren Werke Aktiengesellschaft ("BMW AG"), and BMW Manufacturing Co., LLC ("BMW Manufacturing") (collectively, "Defendants" or "BMW").  The following allegations are based upon personal knowledge as to Plaintiff's own conduct and are made on information and belief as to the acts of others.

## NATURE OF THE ACTION

1.      Throughout the Class Period, Defendants designed, manufactured, produced, distributed, marketed, advertised, warranted, sold and leased various makes and models of BMW vehicles ("Class Vehicles") that contain serious design, manufacturing, or material defects that significantly impact both the safety and value of

1

their vehicles.  Specifically, numerous models of BMW vehicles manufactured during the
Class Period were designed or manufactured so that certain vital electrical components
are often located in the lowest part of the vehicles and are made with or housed in
materials that fail to prevent water or moisture intrusion.  These electrical components
and modules, and/or other vital electronics they are connected to, are responsible for the
safe and effective operation of the vehicle and when they are damaged, can cause the
vehicle to lose power while in operation, experience an electrical malfunction, and/or fail
to start.  Because Defendants decided to place these vital electrical components in what is
often  the lowest part of the vehicle (such as, in some Class Vehicles, the spare tire well
under the trunk) and make or house them using materials that are insufficiently water or
moisture resistant, they are especially prone to water damage that can be caused through
the normal and ordinary use of the vehicle.  When this water damage occurs, the vehicles
experience electrical failure or malfunction and become inoperable and pose a serious
safety risk to those who experience this problem.  Although these components are highly
susceptible to water damage, Defendants provide no warnings or advisories to BMW
owners about the location of this vital equipment or the importance of keeping the
vehicle's trunk compartment free of liquids when they purchase the Class Vehicles.

       2.     To make matters worse, the Class Vehicles were also designed or
manufactured so that drainage tubes used to drain water away from the vehicles' sun
roofs are located in close proximity to the vital electrical equipment often located in the
lowest point of the Class Vehicles.  Unfortunately, these sunroof drains were designed or
manufactured in such a way that they are prone to become clogged with dirt, debris,
leaves, and other naturally-occurring materials, with no warning to the owners of the

Class Vehicles that the drains may become clogged.  When these tubes become clogged, they come loose or leak into the trunks of the vehicles.  These leaks, which eventually saturate the trunks (sides and floor) of the vehicles, cause the vital electronic components contained in the  vehicles' trunks to short—shutting off certain components of the automobile necessary for driving and creating a serious safety risk.

3.      Defendants knew or should have known of the Class Vehicles' defects via numerous complaints filed with the National Highway Traffic Safety Administration ("NHTSA"), detailing the damage caused to the Class Vehicles because of the placement of the vulnerable electronics often in the bottom of  cargo areas.

4.      Defendants also demonstrated their knowledge of the defects described herein via Technical Service Bulletins ("TSBs") relating to Class Vehicles, including but not limited to those TSBs dated August 2004, March 2006, October 2006, January 2008, July 2008, February 2009, July 2009, and August 2009.  Defendants issued these service bulletins to various authorized service providers.  An excerpt from the August 2009 service bulletin appears below:

SITUATION
Water ingress into the luggage compartment may cause various electrical problems or faults associated with the MPM (Micro Power Module); PDC (Park Distance Control); M-ASK (Multi-Audio System Controller); CCC (Car Communication Computer); CID (Control Information Display); TCU (Telematics Control Unit); LOGIC-7 (Top Hi-Fi); RDC (Tire Pressure Monitor) or SDARS (Satellite Radio Receiver) control modules. In most cases, the water collects in the spare wheel recess.

5.      Each of the service bulletins (none of which were distributed to the public), the earliest of which were researched, drafted, and distributed at least six years prior to Plaintiff Catalano's BMW vehicle purchase, described the same defects—water pooling often in the lowest point of the Class Vehicles (where BMW chose to locate the

electronics of the Class Vehicles) and "electrical problems or faults" or "electrical failures" associated with water collecting near the electronic components.

6.      BMW chose not to and did not disclose these service bulletins to owners of the Class Vehicles.  In this service bulletin excerpted above, BMW repair facilities are instructed to replace water damaged modules.  The service bulletin also informs authorized service technicians to locate the electronics to another, less vulnerable, location of the trunk.  The bulletin also instructs repair facilities to place a permanent warning placard in the trunk that specifically warns owners that there is vital electrical equipment in the trunk and to avoid allowing liquids into this area of the vehicle.  The service providers are also instructed to verbally notify Class members "of the label and the fact that liquids should not be present on or under the trunk insulation, due to the sensitive nature of the electronic control units located in the spare tire well."

7.      Despite the existence of these service bulletins *since 2004*, and BMW's knowledge of the defect well before that, BMW has failed to acknowledge the defects, or pay for the necessary repairs to the Class Vehicles (moving the electronics to another location where they are not prone to water exposure).

8.      Defendants demonstrated their knowledge of the defects through the service bulletins described herein.  Additionally, Defendants knew or should have known of the defects in the Class Vehicles had they performed adequate testing and analysis of the design, manufacturing or materials used in the Class Vehicles.

9.      Defendants know of the vulnerability of water damaging electronic components  and the grave safety risks this creates.  Yet, Defendants have not informed their customers of the defects or issued warnings about the defects.  Instead, Defendants

actively conceal the safety defects.  Defendants sold vehicles to consumers that they knew, or at the very least should have known, were defective and unsafe, and they concealed information about the defects from their consumers and the public to facilitate sales and reap significant financial benefits.

10.     Despite the obvious defects at issue in this case, Defendants refuse to cover the cost of repairs.  Instead, Defendants place the fault on the consumer for improper maintenance of the vehicle.  They do this even though owner's manuals and the written maintenance program provide no mention of the electronic equipment in the trunk or what steps should be taken to avoid damaging this equipment.

11.     As a direct and proximate result of Defendants concealing the defects, failing to warn their customers of the defects and the safety risks posed by the vehicles, and failing to notify consumers of or remedy the defects, Plaintiff purchased one of Defendants' defective and unsafe cars.

12.     The Plaintiff did not know of the defects in his vehicle until in or around June 2012, and as a result of the defects, Plaintiff's vehicle failed while driving on a four-lane, divided highway with his wife in the car, placing Plaintiff and his wife at a serious risk of injury.

**PARTIES**

A.     **Plaintiff George Catalano**

13.     Plaintiff George Catalano is a citizen of the State of Connecticut and in or around 2010 purchased a 2007 BMW 530xi wagon in New York, New York.  His vehicle came with a Certified Pre-Owned Warranty.  Upon information and belief, the vehicle was designed and manufactured by BMW AG and sold, distributed, advertised, marketed,

5

and warranted by BMW NA.  The vehicle bears the Vehicle Identification Number

WBANN73587CN04972.  Mr. Catalano's vehicle is described as a "sport wagon" and is

used for personal, non-commercial purposes.

14.     Before acquiring his vehicle, Mr. Catalano reviewed and relied on BMW

NA's various marketing and advertising materials, including material on BMW NA's

official website.

15.     In or around the time Mr. Catalano purchased his vehicle, the BMW

website advertised that Certified Pre-Owned vehicles would have "pristine condition,

amazing protection plan, great value.  And oh yeah, it's a BMW."  The website also

provided that "every Certified Pre-Owned BMW is rigorously inspected" and "one of the

smartest buys on the road today."  BMW further represented that "[n]ot every BMW

becomes a Certified Pre-Owned Vehicle.  In fact there's an entire certification process,

including a rigorous inspection."

16.     BMW described its rigorous Certified Pre-Owned Vehicle inspection and

certification process on its website:

> Only the best pre-owned BMWs qualify for the Certified Pre-Owned
> BMW Vehicle Program. To be eligible for enrollment in the Certified Pre-
> Owned Vehicle Program, a late-model vehicle must be in service for at
> least six months or have more than 6,000 miles but less than 60,000 miles
> on the odometer. They must pass an extensive examination—a thorough
> and rigorous inspection by BMW factory-trained technicians. They inspect
> the vehicle for safety, performance and wear. If something is not right, it is
> fixed. If it cannot be fixed, the car cannot become a Certified Pre-Owned
> BMW.
>
> In short, we're picky. **But when you see everything covered under our
> Protection Plan, you'll understand why**.
>
> Ask to see the Certified Pre-Owned Inspection Checklist. It is your
> assurance of the quality, reliability and overall pleasure BMW owners
> have come to expect.

(emphasis added).

17.     In or around June 2012, as Mr. Catalano and his wife were driving to visit family, the car experienced a complete electrical failure—the entire dashboard lit up, and lights flashed indicating that a "complete electrical failure" was "imminent."  The car shut down completely while he was driving on a four-lane, divided highway.  Fortunately for Mr. Catalano and his wife, he was able to avoid a collision and pull his vehicle into a parking lot.  They could have been involved in a serious, and possibly fatal, accident.

18.      Mr. Catalano was able to get his vehicle to a BMW dealership, where he was informed that the car was still covered by BMW NA's Certified Pre-Owned Warranty.

19.     The dealership found that a substantial amount of standing water (nearly two inches) had accumulated around the electronics in the trunk of the car, underneath the car's spare tire compartment.

20.     The dealership was able to perform some repairs to replace corroded electronics and drain the water from around the electronic modules.  It also found that water had infiltrated the trunk as a result of clogged sunroof drain tubes.

21.     Although BMW made certain representations that "everything" would be covered under the Certified Pre-Owned Warranty, and that a rigorous inspection and certification process would have repaired everything (else the vehicle would not have been Certified Pre-Owned), BMW NA refused to cover the repairs under its Certified Pre-Owned Warranty.  As a result, Mr. Catalano incurred costs of nearly $2,000 to pay for them.

22.     The electronics in the vehicle were not moved from the lowest portion of the trunk compartment and the dealership made no attempts to make the compartment or electronic components watertight.  The defects persist in Mr. Catalano's vehicle and the ineffective repairs provide for a substantial likelihood that his vehicle will fail again.

23.     Although Mr. Catalano's vehicle is a "sport wagon," he is now informed that he should not place water bottles in the trunk, or even take the vehicle into locations where it might be susceptible to rain or moisture—such as taking the vehicle camping. Had Mr. Catalano known of the defects relating to the placement of electronic components in the trunk compartment of his vehicle and their susceptibility to damage by water or moisture intrusion, he never would have purchased the vehicle.

24.     Like Mr. Catalano, other absent class members have experienced problems related to the defective design or manufacturing of the Class Vehicles, and will continue to experience problems related to the Class Vehicles' defects as Defendants have not initiated an effective repair initiative to address the defects.

25.     Mr. Catalano notified BMW of the defects and damage to his car caused by the defects in 2012.  BMW refused to cover the repairs to Mr. Catalano's vehicle.

**B.      Defendants**

26.     Defendant BMW of North America, LLC ("BMW NA"), is a corporation organized and existing under the laws of the State of Delaware and registered with the New York State, Department of State to conduct business in New York.

27.     Defendant Bayerische Motoren Werke Aktiengesellschaft ("BMW AG") is a foreign corporation organized and existing under the laws of the Federal Republic of

Germany.  BMW NA is a wholly owned subsidiary of BMW (US) Holding Corporation,

a Delaware corporation, which is a wholly owned subsidiary of Defendant BMW AG.

28.     Defendant BMW Manufacturing Co., LLC ("BMW Manufacturing") is a

Delaware limited liability company with its principal place of business in South Carolina.

BMW Manufacturing is also a wholly owned subsidiary of BMW AG.

29.     At all times relevant herein, BMW AG designed and manufactured motor

vehicles, parts, and other products for export and sale throughout the world, including the

Class Vehicles sold in the State of New York.

30.     At all times relevant herein, BMW NA was engaged in the business of

marketing, importing, distributing, warranting, and selling automobiles and other motor

vehicles and motor vehicle components throughout the United States, including Class

Vehicles in the State of New York.

31.     BMW Manufacturing was the sole global producer of the BMW X3 and

X5 model vehicles sold in the State of New York.

## JURISDICTION AND VENUE

32.     The Court has original jurisdiction over this class action pursuant to 28

U.S.C. § 1332 and the Class Action Fairness Act ("CAFA").  Plaintiff and many other

members of the putative Classes are residents and citizens of states different from the

home state of Defendants.  Plaintiff is informed and believes, and based thereon alleges,

that the amount in controversy in this case, exclusive of interest and costs, exceeds

$5,000,000.

33.     Venue is proper pursuant to 28 U.S.C. § 1391 in that Plaintiff purchased

his BMW vehicle in this district and a substantial part of the events or omissions giving

rise to Plaintiff's claims occurred in this district.  In addition, Defendants do substantial

business in this judicial district, have received substantial benefit from doing business in

this judicial district, and have knowingly engaged in activities directed at consumers in

this judicial district.  Furthermore, a significant number of Defendants' automobile sales

and leases occur in New York, and the wrongful acts alleged herein have affected

members of the putative Classes who have engaged in transactions with Defendants in

New York.  New York has a significant contact or aggregation of contacts to the claims

at issue herein in that BMW AG designs and manufactures the vehicles at issue; BMW

NA promotes, markets, and sells the vehicles at issue in the State of New York; and

BMW Manufacturing produces the X3 and X5 model vehicles.  Defendants BMW AG,

BMW NA, and BMW Manufacturing are subject to personal jurisdiction in the State of

New York and in this judicial district.

## FACTUAL ALLEGATIONS

### A.   The Defects

34.     All BMW-designed X5 series vehicles (from 2000 to 2008), X3 series

vehicles (from 2004 to 2010), and 5 series vehicles (from 2004 to 2010) (the "Class

Vehicles") are similarly equipped with various electronic component parts, which are

neither water-proof nor water tight, which are also often located in the lowest points of

the Class Vehicles.  These components control and/or are connected to other electronics

controlling critical and important aspects of the vehicle and must operate properly in

order for the vehicles to run.  Additionally, all Class Vehicles come equipped with

sunroofs containing four drain tubes, two of which are in close proximity to the electronic

component parts.  These drain tubes are prone to clogging and leaking within the body of the car.

35.     In all of the Class Vehicles, critical modules and electronic components are located often in the lowest point of the vehicles—such as the trunks and cargo areas—where they are prone to damage and failure due to water exposure.  Water can enter the trunk or cargo areas through normal use of the vehicle and clogs in the sunroof drains.  The Class Vehicles suffer from  inherent design defects, were not manufactured in accordance with BMW AG's intended specifications, and/or contained electronic components that were placed in the trunk compartment and made with or housed in materials that were not sufficiently water or moisture resistant.

**B.      BMW's Owners Manuals**

36.     Every BMW vehicle owned or leased by Class members comes with an owner's manual.  The purpose of the manual is to provide owners with "important data and instructions intended to assist [Class members] in gaining maximum use and satisfaction from [their] BMW's unique range of technical features."  The manual also claims that it "contains information on maintenance designed to enhance operating safety and contribute to maintaining the value of your BMW throughout an extended service life."  The manual is expressly made part of the Warranty for the vehicle.  The manual is also described by BMW AG as "an important component of your vehicle" that should be read thoroughly by all BMW owners.  At all times Plaintiff and Class members relied on Defendants to provide complete and accurate information about the operation and maintenance of the Class Vehicles to avoid damage to the vehicles and ensure that it is operated safely.

37.     In all of the Owner's Manuals provided to Class members, BMW AG provides numerous recommendations, warnings, and precautions that Class members should heed when operating and/or using their vehicles.  To highlight particular issues, the manuals use specific warning symbols to show "precautions that must be followed precisely in order to avoid the possibility of . . . serious damage to the vehicle."

38.     Throughout the Owner's Manuals provided with the Class Vehicles, BMW AG provides page after page of detailed information concerning the vehicle's trunk, how it should be opened and what steps can be taken to avoid damaging the trunk. For example, BMW AG warns Class members that when they open their trunk lid it "pivots back and up."  Therefore, owners should "make sure that adequate clearance is available before opening the trunk."  In fact, the owner's manual repeatedly warns consumers to make sure they do not close the trunk lid on their hands.

39.     Despite these numerous warnings of obvious dangers, nowhere in the owner's manuals provided to Class members, does BMW AG tell consumers to avoid spilling liquids in the trunk or that located often in  the bottom of the trunk compartment is vital electrical equipment that will be ruined, malfunction, and fail if water enters the trunk.

40.     Additionally, the owner's manual provided with all Class Vehicles contains three full pages of detailed instructions concerning how to safely operate and maintain the vehicle's sun roof.  Again, the manual provides numerous warnings of obvious dangers such as telling owners to avoid shutting the roof on their hands.  Despite this, the manual says nothing about the drainage tubes, the fact that they are prone to

clog, or that if they do become clogged this can lead to dangerous, catastrophic, and expensive damage to the vehicle's vital electronic equipment.

**C.**     **BMW's Maintenance Program**

41.     In addition to providing Class members with Owner's Manuals that supposedly provide owners with complete and accurate information needed to properly maintain class vehicles, BMW NA also includes a written Maintenance Program with all Class Vehicles.  According to BMW NA, the Maintenance Program was designed with the following objectives:  "to maximize vehicle safety, reliability and resale value by minimizing breakdowns resulting from wear and minimizing cost."  BMW NA describes the Maintenance Program provided with Class Vehicles as a "benefit designed to help reduce the cost of ownership" and that following its maintenance recommendations will "help [Class members] maximize [their] satisfaction with [their] BMW, its longevity, and resale value."

42.     The written Maintenance Program provided with each Class Vehicle provides a long list of things that Class members must do to their vehicles on a regular basis to maximize its "longevity and resale value."  This list includes maintenance such as changing the oil, checking the brake pads, and changing vital fluids.  The Program also provides a long list of inspections that should be performed to ensure that all aspects of the vehicles are operating properly.  Those inspections include visual inspections of the headlights, flashers, seatbelts, windshield wipers, review mirrors, tires, etc.

43.     Despite providing numerous details concerning how Class Vehicles should be maintained in order to ensure their longevity and resale value, nowhere in the written Maintenance Program does BMW NA warn consumers that critical electronic equipment

in the vehicle is highly vulnerable to water damage or that the vehicles' sun roof drainage tubes can be easily clogged and lead to the damage of this vital equipment.  In fact, nowhere in the maintenance program does BMW NA advise consumers about the existence of the drainage tubes, that they can become easily clogged with debris, or that they should be cleaned on a regular basis.  As a result, all BMW owners are put at extreme risk of serious injury and/or damage to their vehicles.

**D.**     **BMW's Warranty**

44.     All Class Vehicles come with a New Vehicle Limited Warranty, extended limited warranty or Certified Pre-Owned Warranty (collectively, "BMW Warranty").

45.     Under the BMW Warranty, BMW NA warrants all class vehicles "against defects in materials or workmanship."  Vehicles that are found to have a defect will be repaired "without charge for parts or labor."  BMW NA's Certified Pre-Owned Warranty also provides protection from defects in materials or workmanship and states that "[t]his broad coverage includes the following parts and systems . . . Electrical."  The New Vehicle Limited Warranty expressly excludes damage to the vehicles caused by "lack of or improper maintenance" and damage caused by the "failure to maintain the vehicle properly in accordance with the instructions in the Owner's Manual  . . . that result in the failure of any part of the vehicle."  Similarly, the Certified Pre-Owned Warranty does not cover problems related to "[m]aintenance . . . ."

**E.**     **Defendants Conceal the Safety Defects from Their Customers and Refuse to Pay for Repairs**

46.     On its website, BMW NA claims that it "prepare[s] [its] vehicles for the unexpected," and that its "quest for the next innovation" is "not just about greater power and more efficient performance.  It's also about safety."

47.     Despite BMW NA's safety claims, as described above, the Class Vehicles present a safety hazard and are unreasonably dangerous to consumers because of the danger of catastrophic electrical system failure or fire hazards as a result of the vulnerable location of its key electrical components.  As a result, the vehicles are unsafe to drive.

48.     Even though Defendants knew that the location of its key electrical components would subject them to catastrophic failure, potential fire hazards, and legitimately compromise driver and passenger safety, it failed to warn consumers about this risk, and actively concealed it.

49.     The existence of the Class Vehicles' defects would be considered material by a reasonable consumer deciding whether to purchase a vehicle.  Had Plaintiff and the Class members known that the Class Vehicles contained the defects alleged therein, they would not have purchased or leased the Class Vehicles.

50.     Reasonable consumers, like Plaintiff and the Class members, expect and assume that a vehicle's electronic component parts are safe and would not be placed in a position where they would be exposed readily and easily to water.  Plaintiff and Class members would also be reasonable in assuming that Defendants would not design, manufacture, distribute, supply, market, advertise, sell or lease vehicles with known safety defects, and would disclose any defects to consumers when it learns of them. Further, Plaintiff and Class members would also be reasonable in assuming that Defendants would not fail to disclose the defects, persistently deny the defects, and charge thousands of dollars to repair the defects.

51.     When water infiltrates sensitive electronic components and attendant wiring often located in the lowest point of the trunk compartment of Class Vehicles, the

15

components and wiring corrode, short, malfunction, and cause the vehicles to fail. Consumers have described these defects as an "electronics swimming pool" and "puddl[ing]" in the spare tire compartment where, undetectable to consumers, the vehicles' electronic modules and other electrical components are located. Such "pooling," "puddling" and water infiltration is a serious safety issue.

52.     Owners of the Class Vehicles filed complaints with NHTSA detailing the numerous electronic and safety issues that were caused as a result of the defects in at least 2008 and 2009, prior to when Plaintiff and members of the Class purchased or leased the Class Vehicles. Such complaints further demonstrate Defendants' knowledge of the defects described herein. For example:

- NHTSA ID Number 10267870, filed May 6, 2009. "The sunroof drain clogged in my 2006 BMW 530 XI station wagon **causing water to pool in the car and short out the electrical system while I was driving**, which resulted in the loss of power to the dashboard including the speedometer. . . . My husband inspected the trunk where the water was pooling, while we waited for the tow truck, there were relay wires where the water was pooling and heat and [s]team coming from the area. . . ." (emphasis added).

- NHTSA ID Number 10233671, filed July 7, 2008. "If you carry liquids which spill in your trunk, the liquid can seep through and burn the wires, or **the car will stop running** (per service department), **which can cause an accident**. . . . We took the car in. The service rep. called & asked me if I had spilled water in the trunk. I told him on [July 4, 2008] a water bottle spilled. He told me due to the water spill, the repair would not be covered under the warranty. He

16

said that they ran tests and the wires were burnt. . . .  **I was not warned the wires are down there & not to carry liquid in the trunk**.  I asked if I could drive the car and he said no there is a possibility of the car shutting down when the wires are burned.  I can't use the trunk for grocery shopping for fear that something will 'leak' and cause the wires to 'burn' again, creating a possible fire hazard.  If there is no fire due to the burnt wires, there is the possibility of the car 'shutting down,' causing an accident which could cause injury to myself or another party.  The general public should be warned the BMW trunk can't handle transporting liquid stored in containers. . . ."

53.     Owners of the Class Vehicles also filed complaints on various forums dedicated to car safety describing their experiences with the defects' symptoms.  For example:

- **"[F]ive minutes before entering the [ ] turnpike, my vehicle went into total electrical failure and my steering locked** . . . [I] had it towed to our local bmw dealer which found that the cassette on the panoramic sunroof to be defective . . . that caused a great deal of water to get into the vehicle and go under the spare tire in the rear where all the electrical is.  [I] put a complaint into bmw of north America because a. the electrical should not be put under the spare tire where water could get in and b. I was about to get on the turnpike where the speed limit is 65 mph . . . there could have been a terrible accident.  [I]t was [$]2498 to fix the issue, bmw was willing to pay half and relocate all the electrical to a safer more dryer place . . . there should be a

recall on this issue, **bmw needs to relocate the electrical components to a safer area than underneath the spare tire**." [sic]

- "The sunroof drain clogged . . . causing water to pool in the car and **short out the electrical system while I was driving** . . . the dealership tells me that it's a common problem . . . there were relay wires where the water was pooling and heat and steam coming from the area . . . I'm fairly sure that if we had left it much longer it could have caused a fire."

- BMW Vehicle "suffered a complete electrical failure after the sunroof drainage system drained rain water into the compartments where . . . various . . . computer modules are stored . . . the car displayed two system malfunctions, followed shortly thereafter by the message 'Electronic system malfunction. Continued driving not possible'" . . . The BMW dealer confirms that the sunroof drained rain water into the electronics compartments, shorting out at least four computer modules . . . certain system components, including an air bag control unit, showed evidence of a fire (presumably due to a short caused by the rain water) . . . ."

54.     At all relevant times, Defendants expressly told Plaintiff and Class members that their Owner's Manuals and written Maintenance Program provided complete and accurate information concerning the risks associated with their vehicles and the maintenance that should be performed in order to ensure that the vehicle could be operated safely. Plaintiff and Class members relied on the accuracy and completeness of these vital written documents when deciding to purchase their vehicles. However, as

described above, the Owner's Manual and Maintenance Program are incomplete and fail to provide vital information about known risks associated with the Class Vehicles.

55.     Only after purchasing or leasing their vehicles were Plaintiff or Class members able to determine that the Class Vehicles are highly prone to interior flooding and the potential catastrophic failure of their electrical components.  They learn this only after water floods their vehicle's trunks and causes extensive interior damage to the electronic components located in the trunk compartments of the vehicle, disrupting operational use of the vehicle, and causing the car to undergo extensive and expensive repairs.

56.     The cost to repair the defects described herein are exorbitant because consumers will be required to pay hundreds, if not thousands, of dollars to repair damage to the Class Vehicles' electrical systems and other damage that occurs as a result of flooding.

57.     Moreover, the defects described herein materially impact the value of the Class Vehicles since few, if any, consumers would ever purchase a Class Vehicle knowing they are unsafe and prone to breakdown as a result of water damage.

58.     If Plaintiff and Class members had known about the aforementioned design, manufacturing and/or materials defects and the danger posed by such defects at the time of sale or lease, Plaintiff and members of the Classes would not have purchased or leased their vehicles and/or would have refused to pay for repairs that Defendants had a duty to provide without charge.  As a result of their reliance on Defendants' omissions and/or material misrepresentations, owners and/or lessees of Defendants' vehicles, Class

members have suffered ascertainable loss of money and/or property and/or loss in value of their vehicles.

59.     Defendants had superior and exclusive knowledge of the defects and knew or should have known that the defects were not known or reasonably discoverable by Plaintiff and Class members before they purchased or leased the Class Vehicles.

60.     Plaintiff is informed and believes and based thereon allege that Defendants acquired their knowledge of the defects prior to the time Plaintiff purchased or leased the Class Vehicles at issue in this Complaint.

61.     Defendants knew that the location of the Class Vehicles' electrical components were defective and not fit for their intended purpose.  For example, BMW NA's technical service bulletins, repair invoices, and other documents not generally available to consumers reveal that it was aware of water ingress problems into the trunk compartment and that such water ingress resulted in water damage to the electronic components located in the trunk compartment.  Upon information and belief, Defendants also knew of these defects from numerous consumer complaints, warranty claims, and repair orders from BMW dealerships.  Nevertheless, Defendants actively concealed and failed to disclose these defects to Plaintiff and the putative Class members at the time of purchase or lease and thereafter.

62.     Defendants intentionally misrepresented, either affirmatively or by omission, that their vehicles were free from defects, and took no action to adequately warn or remedy the defects, but instead concealed, suppressed, and failed to disclose the potential damage that could be caused by such design, manufacturing and/or materials defects.

63.     In fact, Defendants systematically, purposefully, and fraudulently concealed the defects and misled customers by telling them that any problems in connection with the defects were actually caused by customers' failure to maintain their vehicles properly and/or by "outside influences"—by claiming, for example, that the flooding in the trunk and electronic damage was not due to design, manufacturing and/or materials defects but rather due to the customer's failure  to clean out the sun roof drain tubes and/or even telling Class members that such damage was merely due to weather.

64.     Based upon information and belief, although BMW received valid warranty claims under the Class Vehicles' warranties or Certified Pre-Owned Warranties, it routinely denied them as part of their fraudulent concealment and breaches of warranty.

65.     At no point do BMW AG's own maintenance or service manuals make reference to or provide any instruction on how customers can avoid having their drains clog, nor has BMW NA issued any Technical Service Bulletins regarding the process of how such defective sunroof drains should be cleaned.

66.     Despite their awareness and actual knowledge of the design, manufacturing and/or materials defects referenced herein and the attendant problems evidenced by, among other things, a great number of customer complaints, Defendants continue to fail to warn, or even mention, anything about the location of the Class Vehicles electrical components or the flood-causing sunroof drain defects through their agents or in the owner's manual or any of their marketing materials.

67.     Defendants knew that the defective Class Vehicles were causing substantial problems for the putative Class members; however, upon information and

belief, Defendants have systematically refused to pay for repairs required to putative

Class members' vehicles caused by the uniform defects described herein.

68.     While the damages are caused by Defendants' design, manufacturing

and/or materials defects in Class Vehicles and while numerous customers have requested

that Defendants remedy and/or address the defects and the resulting flooding problems at

Defendants' own expense, Defendants and their agents have failed and/or refused to do

so.

69.     To date, Defendants have failed to warn or inform their customers of the

known defects, and actively concealed these defects from consumers and Plaintiff and

other Class members.

70.     At the same time, unknown to most (if not all) Class members, BMW NA

issued service bulletins to its authorized service technicians—warning them of the defects

and that certain repairs to the Class Vehicles may ameliorate the issues created by

BMW's choice to place vital electronics often in the lowest point of the Class Vehicles.

For example, the service bulletins advise authorized service technicians that they may

relocate the electronic components often from the lowest point in the trunk to a higher

point in the trunk that would not subject the electronic components to damage caused by

leaks and standing water through ordinary and expected use of the vehicles.  Service

centers are also required to install a warning label advising consumers to avoid spilling

liquids in the trunk of the vehicle.

71.     Despite issuing service bulletins on this issue since 2004, and being on

notice of the defects from numerous consumer complaints, dealership repair orders,

warranty claims, NHTSA complaints, and other sources, Defendants have not recalled the

Class Vehicles to repair the defects, have not offered all of their customers a suitable repair, modification, or replacement of the defective components free of charge, and have not offered to reimburse the Class members who incurred costs relating to flooding and the subsequent damage and failure of the electronic component parts located in the Class Vehicles' trunks.

72.     As a result of Defendants' conduct alleged herein, Plaintiff and Class members have been harmed and have suffered actual damages in that the electronic component parts located in the Class Vehicles' trunks are experiencing continuous and progressive failure problems, and will continue to fail before their expected useful life has run.

## TOLLING OF THE STATUTE OF LIMITATIONS

73.     Since the defects in the design, manufacture or materials of the Class Vehicles cannot be detected until the defects manifest, Plaintiff and the Class members were not reasonably able to discover the problem until after purchasing or leasing the Class Vehicles, despite the exercise of due diligence.

74.     Plaintiff and the Class members had no realistic ability to discern the Class Vehicles' defects until after water collected in the trunk near the electrical components of the Class Vehicles.  In addition, despite their due diligence, Plaintiff and the Class members could not reasonably have been expected to learn or discover that they were deceived and that material information concerning the vulnerability of the trunk's electrical components was concealed from them until after the manifestation of the failure.  Therefore, the discovery rule is applicable to the claims asserted by Plaintiff and the Class members.

75.     Moreover, Defendants are under a continuous duty to disclose to the Plaintiff and the Class members the true character, quality, and nature of the Class Vehicles and to disclose the existence of any defects.  Defendants knowingly, affirmatively, wrongfully, and/or actively concealed the true character, quality, and nature of the defects at issue.  Furthermore, Plaintiff reasonably relied upon Defendants' knowing, affirmative, wrongful, and/or active concealment.  Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

76.     The causes of action alleged herein did or will accrue only upon discovery of the defects referenced herein, Defendants' refusal to cover the repairs of the Class Vehicles, and Defendants' fraudulent concealment of the defects.  Plaintiff and Class members did not discover and could not have discovered through the exercise of reasonable diligence the true nature of the defects.

## CLASS ACTION ALLEGATIONS

77.     Plaintiff brings this action both individually and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) against Defendants on his own behalf and on behalf of the Class and Breach of Warranty and Injunctive Relief Subclasses (collectively, the "Class") defined below.

78.     Plaintiff brings this class action on behalf of himself and the following proposed Class:

> All persons who purchased or leased any BMW X5 series vehicles, X3 series vehicles, and 5 series vehicles in New York.

79.     Plaintiff also brings this class action on behalf of the following proposed Subclasses:

<u>Warranty Subclass</u>
All persons who purchased or leased any BMW X5 series vehicles, X3
series vehicles, and 5 series vehicles in New York and, who submitted
their vehicle for repairs pursuant to TSBs under the vehicle's warranty for
water damage to any  electronic components located in the lowest portion
of the trunk compartment of the vehicle and incurred out of pocket
expenses as a result of BMW NA's refusal to make the repairs under the
vehicles' warranty.

<u>Injunctive Relief Subclass</u>
All persons who purchased or leased any BMW X5 series vehicles, X3
series vehicles, and 5 series vehicles in New York, and the electronics of
those vehicles are located in the lowest portion of the vehicles' trunks.

80.     Subject to additional information obtained through further investigation
and discovery, the foregoing definitions of the Class and Subclasses may be expanded or
narrowed by amendment or amended complaint.  Specifically excluded from the
proposed Class and Subclasses are Defendants, their officers, directors, agents, trustees,
parents, children, corporations, trusts, representatives, employees, principals, servants,
partners, joint venturers, or entities controlled by Defendants, and their heirs, successors,
assigns, or other persons or entities related to or affiliated with Defendants and/or their
officers and/or directors, or any of them; the Judge assigned to this action, and any
member of the Judge's immediate family.

81.     Numerosity.  Though the exact number and identity of Class members is
not presently known, they can be identified in Defendants' records through coordinated
discovery pursuant to this class action.  Plaintiff believes that hundreds of thousands of
BMW vehicles equipped with the defective trunk electronic components have been sold
or leased in the United States, including in the State of New York.

82.     Existence and predominance of common questions.  Common questions of
fact and law predominate over any questions affecting only individual members of the

Class and Subclasses.  The predominating common or class-wide questions of fact include the following:

a.  Whether the Class Vehicles designed and manufactured by BMW AG, supplied, distributed, marketed, advertised and sold by BMW NA, and produced by BMW Manufacturing (as to the X3 and X5 models) contained material defects and posed a safety risk to consumers;

b.  Whether the Class Vehicles' Owner's Manuals, written Maintenance Program, and product labeling sufficiently warn consumers about the dangers associated with the Class Vehicles;

c.  Whether BMW AG's inadequate maintenance recommendations cause significant safety risks or additional damage to the Class Vehicles;

d.  Whether Defendants knew or should have known of the defects prior to distributing Class Vehicles to Plaintiff and Class members;

e.  Whether Defendants knowingly failed to disclose and warn of the electronic component placement defects with the intent that others rely upon such concealment, suppression, or omission;

f.  Whether Plaintiff and Class members are entitled to entry of final injunctive relief compelling Defendants to notify consumers, inspect and, as necessary, effectively repair and/or replace the electronic component defects referenced herein;

g.  Whether Plaintiff and Class members are entitled to entry of final injunctive relief compelling Defendants to fully and adequately inform

consumers of the electronic component placement and/or inadequate maintenance recommendations;

h.      Whether Defendants had a duty to disclose to their consumers material facts concerning the serious problems that would inevitably result from their defective placement of electronic component parts or defective materials used to make or house such electronic components or that such vehicles were not manufactured in accordance with intended specifications;

i.      Whether Defendants concealed the defects as well as the safety risk their vehicles posed to consumers;

j.      Whether the defects in the Class Vehicles subject the Class Vehicles to an unreasonable risk of failure;

k.      Whether the Class Vehicles are likely to pose a serious safety risk to consumers before the end of the Class Vehicles' reasonable expected lives;

l.      Whether BMW NA breached express warranties relating to the Class Vehicles by failing to notify consumers, replace, repair or correct the defects in the Class Vehicles;

m.      Whether BMW NA breached its written contracts with owners or lessees of Class Vehicles;

n.      Whether Defendants breached implied warranties of merchantability or fitness for a particular purpose relating to the Class Vehicles;

27

o.  Whether Defendants should issue a maintenance directive on checking the sunroof drains for clogs as a part of its recommended scheduled maintenance service.

p.  Whether Defendants omitted or concealed or failed to disclose material information regarding the defects in the Class Vehicles and the Class Vehicles' safety issues;

q.  Whether Defendants failed to warn consumers regarding the defects;

r.  Whether Defendants failed to warn consumers about the Class Vehicles' serious safety issues;

s.  Whether Defendants should be ordered to disgorge all or part of the profits they received from the sale of the defective Class Vehicles;

t.  Whether Plaintiff and Class members are entitled to damage, including compensatory, exemplary, and statutory damages, and the amount of such damages;

u.  Whether Plaintiff and Class members are entitled to an award of reasonable attorneys' fees, pre-judgment interest, post-judgment interest, and costs.

83.  Defendants' defenses, to the extent that any such defenses apply, are applicable generally to Plaintiff and the entire Class and are not distinguishable as to proposed Class members.

84.  Typicality.  Plaintiff's claims are typical of the claims of the Class members, as all Class members were and are similarly affected by Defendants' wrongful conduct complained of herein.  Plaintiff and each of the Class members lease or leased

28

and/or own or own BMW vehicles designed or manufactured with a defective placement of electronic component parts in the trunk of the Class Vehicles, which are subject to catastrophic failure due to their placement in a vulnerable position.

85.     Adequacy.  Plaintiff is an adequate representative of the Class and Subclasses because his interests do not conflict with the interests of the Class members he seeks to represent.  Plaintiff has retained counsel highly experienced in the prosecution of complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of all members of the Class and Subclasses.

86.     Superiority.  A class action is superior to any other methods available for both fair and efficient adjudication of the rights of each class member.  Joinder of individual Class members is impracticable.  Individual litigation would be unnecessarily costly and burdensome and would deter individual claims.  To process individual cases would increase both the expenses and the delay not only to Class members, but also to Defendants and the Court.  In contrast, a class action in this matter will avoid case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results and equal protection of the rights of each class member, all by way of the comprehensive and efficient supervision of the litigation by a single court.

87.     The Class and Subclasses may be certified because:

a.     The prosecution of separate actions by individual Class

members would create a risk of inconsistent or varying adjudications with respect to individual members of the proposed Class that would establish incompatible standards of conduct for Defendants;

        b.     The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

        c.     Defendants have acted or refused to act on grounds generally applicable to the Class members, thereby making appropriate final and injunctive relief with respect to Class members as a whole.

## FIRST CLAIM FOR RELIEF
### (For Fraudulent Concealment)

88.     Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

89.     As set forth more fully above, at all relevant times, including as early as 2004, Defendants knew (e.g., through issuance of service bulletins to dealerships, customer complaints, warranty claims, and communications with BMW authorized service technicians) that the Class Vehicles that BMW AG designed and manufactured, that BMW NA distributed, warranted, marketed and sold, and that BMW Manufacturing produced were defective in their design and manufacture, would fail in advance of their anticipated useful life under ordinary use and conditions

90.     Also as more thoroughly set forth above, Defendants knew that the defects posed a serious safety risk to Plaintiff and Class members, but purposefully concealed that information from them.

91.     Defendants concealed material information regarding the defects.

92.     Defendants were and are under a duty to Plaintiff and Class

members to disclose these facts because they had exclusive knowledge of material facts

regarding the defects and the safety risk to Plaintiff and Class members, facts not known

to Class members.

93.     Defendants actively concealed from Plaintiff and Class members the

fact that Class Vehicles were and are defective and pose a serious safety hazard at the

time it placed the vehicles into the stream of commerce.

94.     Defendants' concealment continues today as they have done nothing

to warn consumers of the defects or the serious safety risk of their vehicles and have done

nothing to remove the vehicles from the marketplace.

95.     Defendants fraudulently and intentionally concealed from, or failed

to disclose to, Plaintiff and Class members the facts described herein with the intent to

defraud Plaintiff and Class members and for the purpose of inducing Plaintiff and Class

members to act thereon by purchasing or leasing the Class Vehicles.

96.     Defendants knew that Plaintiff and Class members would not

purchase the Class Vehicles if Defendants disclosed the defective nature of the design

and manufacture of the vehicles.

97.     Plaintiff and Class members were unaware of the defective nature of

the Class Vehicles and unaware that, because of those defects, the Class Vehicles were

prone to fail and posed a serious and potentially fatal safety hazard.

98.     Had Defendants disclosed the true unsafe and defective nature of the

Class Vehicles, Plaintiff and Class members would not have purchased or leased the Class Vehicles.

99.     As a direct and proximate cause of Defendants' misconduct, Plaintiff and Class members have suffered actual damages.

100.    Plaintiff and Class members have also suffered unreasonable diminution in value of their Class Vehicles as a result of Defendants' misconduct.

101.    Defendants' acts were done deliberately and with intent to defraud the general consuming public, and in reckless disregard of Plaintiff's and Class members' rights and well-being and to enrich Defendants.

102.    Defendants' misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## SECOND CLAIM FOR RELIEF
### (For Violations of N.Y. G.B.L. § 349)

103.    Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

104.    Plaintiff and other members of the Class are "consumers" in accordance with N.Y. GBL § 349.

105.    At all relevant times material hereto, Defendants conducted trade and commerce in New York and elsewhere within the meaning of GBL § 349.

106.    Defendants concealed the following material facts:

      a.   The Class Vehicles are designed, manufactured and sold with defects that pose a substantial safety hazard to the consumer.

b.  The Class Vehicles are defective because they are designed or manufactured in such a way that electronic components in the Class Vehicles' trunks are prone to failure due to their placement and susceptibility to water exposure.  When these electronic components are damaged, they can cause the vehicle to lose power while in operation, posing a serious safety risk to those who experience this problem.  Although these electronic components are highly susceptible to water damage, Defendants provide no warnings or advisories to BMW owners or lessees about the location of this vital equipment or the importance of keeping the vehicle's trunk compartment free of liquids.  In addition, the Class Vehicles come equipped with sunroofs containing four drain tubes, two of which are in close proximity to modules, including the SDARS, RDC, and PDC modules.  These drain tubes are prone to clogging and leaking within the body of the car.

107.    Defendants consciously failed to disclose material facts from Plaintiff and other Class members with respect to the use and dangers associated with the Class Vehicles.

108.    Defendants intended that Plaintiff and Class members rely on Defendants' acts of concealment and omissions, so that Plaintiff and Class members would purchase or lease the Class Vehicles.

104. The foregoing acts, omissions and practices proximately caused Plaintiff and Class members to suffer actual injury, including, monies spent to replace, repair or maintain the Class Vehicles.

## THIRD CLAIM FOR RELIEF
### (Breach of Implied Warranty of Merchantability, N.Y. U.C.C. § 2-314)

109.    Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

110.    Defendants are "merchants" within the meaning of N.Y. U.C.C. § 2-314.

111.    The Class Vehicles are "goods" within the meaning of N.Y. U.C.C. § 2-314.

112.    Defendants' implied warranty of merchantability accompanied the sale of the Class Vehicles to Plaintiff and Class members.

113.    Defendants, by implication, warranted that the Class Vehicles were fit for ordinary use.

114.    The Class Vehicles are not fit for their ordinary purpose of providing reasonably and reliable safe transportation because, inter alia, the Class Vehicles and their electrical systems suffered from inherent defects at the time of sale and thereafter are not fit for their particular purpose of providing safe and reliable transportation.

115.    As set forth herein, any effort by Defendants to disclaim or otherwise limit their responsibility for the defective Class Vehicles is unconscionable under all of the circumstances, including because Defendants knew that the Class Vehicles were unfit for normal use.  Through the conduct described herein, Defendants have breached their implied warranty of merchantability and are liable to Plaintiff and Class members.

116.    Plaintiff and Class members were intended third-party beneficiaries of the contracts for sale of the Class Vehicles from Defendants to the dealerships who ultimately sold the Class Vehicles to Plaintiff and Class members.  BMW AG, which in part designs and manufactures Class Vehicles, BMW NA which in part distributes,

34

markets, warrants and sells Class Vehicles, and BMW Manufacturing, which produces the X3 and X5 Class Vehicles, knew that Plaintiff and the Class members were the end-users of the Class Vehicles, and brought themselves into privity with Plaintiff and Class members who relied upon written representations and advertisements made by Defendants as alleged herein.  In addition, Plaintiff and Class members were in privity with BMW NA through written warranty agreements relating to their vehicles.

117.    As a direct and proximate cause of Defendants' breach of implied warranty, Plaintiff and Class members have sustained damages and other losses in an amount to be determined at trial.

118.    Plaintiff and other Class members have provided timely notice to Defendants regarding the problems they experienced with the Class Vehicles and, notwithstanding such notice, Defendants have failed and refused to remedy the problems.

## FOURTH CLAIM FOR RELIEF
### (Breach of Implied Warranty of Fitness For a Particular Purpose, N.Y. U.C.C. § 2-315)

119.    Plaintiff re-alleges and incorporate the preceding paragraphs as if fully set forth herein.

120.    Defendants are "merchants" within the meaning of N.Y. U.C.C. § 2-315.

121.    The Class Vehicles are "goods" within the meaning of N.Y. U.C.C. § 2-315.

122.    The Class Vehicles owned by Plaintiff and Class members were defectively designed and manufactured and posed a serious safety risk to consumers when sold.

123. The Class Vehicles left Defendants' facilities and control with defects incorporated into the design or manufacture of the Class Vehicles. As a result, the dangerous defects in Class Vehicles were present and persisted at the time of sale or lease.

124. The defects are substantially certain to result in malfunction during the useful life of the product and did malfunction in the useful life of Plaintiff's vehicle.

125. The defects put the consumer at a safety risk upon driving the vehicle. As a result, the Class Vehicles are not fit for transporting the purchaser, lessee or other occupants in a reasonably safe manner.

126. At the time Plaintiff and Class members purchased or leased the Class Vehicles they intended to use the goods for the particular purpose of safe and reliable transportation.

127. At the time of purchase of the Class Vehicles, Defendants knew or had reason to know of this particular purpose and this implied warranty of fitness for a particular purpose was part of the basis of the bargain between Defendants on the one hand and Plaintiff and Class members on the other.

128. Plaintiff and Class members relied on Defendants' skill and judgment to design and manufacture vehicles suitable for this particular purpose.

129. At the time of purchase, Defendants had reason to know that Plaintiff and Class members relied on their skill and judgment.

130. The Class Vehicles, however, when sold or leased to Plaintiff and Class members, and at all times thereafter, were not fit for their particular purpose of providing safe and reliable transportation. Specifically, the Class Vehicles owned by

Plaintiff and Class members were defectively designed and manufactured and left

Defendants' facilities and control with defects incorporated into the manufacture and

design of the vehicle and posed a serious risk to safety after operation.

131.    Accordingly, Defendants breached the implied warranty of fitness

for a particular purpose in that the Class Vehicles are defective and not fit for their

intended purpose of providing safe and reliable transportation.

132.    As fully set forth above, Defendants knew the vehicles posed a

safety risk and were defective and knew of these breaches of implied warranties prior to

selling the vehicles to Plaintiff and the Class members.

133.    As a result of Defendants' breach of their implied warranty of fitness

for a particular purpose, Plaintiff and the Class members have been damaged in an

amount to be proven at trial.

**FIFTH CLAIM FOR RELIEF**
**(Breach of Express Warranty, on Behalf of the Warranty Subclass)**

134.    Plaintiff re-alleges and incorporate the preceding paragraphs as if

fully set forth herein.

135.    As set forth above, the written warranty provided to Plaintiff and the

Class specifically identifies that, if their vehicle fails to operate in a safe and reliable

manner, BMW NA would make all necessary repairs to and/or replacement of any

defective parts found—including for the electrical system—during the vehicle's warranty

period.

136.    Plaintiff and members of the Warranty Subclass submitted their

37

Vehicles for warranty repairs as referenced herein.  BMW NA failed to comply with the terms of the express written warranty provided to each Class member, by failing and/or refusing to repair the subject defects under the vehicle's warranty as described herein.

137.    The acts of BMW NA in failing and/or refusing to repair the defects during the warranty period so as to bring the vehicles into conformity with the express warranties, deprived Plaintiff and members of the Warranty Subclass of their rights guaranteed them under the express warranties offered by BMW NA.

138.    As a direct and proximate result of the willful failure of BMW NA to comply with its obligations under the express warranties, Plaintiff and members of the Warranty Subclass have suffered actual and consequential damages. Such damages include, but are not limited to, the cost of repairing the vehicles, the loss of the use and enjoyment of their subject vehicle, and a diminution in the value of the vehicle containing the defects identified herein. The precise amount of these damages is unknown at the present time but is in excess of the jurisdictional limits of this Court.

<u>**SIXTH CLAIM FOR RELIEF**</u>
**(For Breach of Contract/Common Law Warranty,**
**on behalf of the Warranty Subclass)**

139.    Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

140.    Plaintiff brings this claim on behalf of the members of the Warranty Subclass against BMW NA.

141.    Plaintiff pleads breach of contract under common law in the alternative to his breach of express warranty claim under New York's Uniform Commercial Code.

142.    BMW NA breached its warranty or contract obligation by failing to repair or replace electronic components located in the lowest part of Class Vehicles' trunk compartments and evidenced electrical failure or malfunction as a result of liquid or moisture intrusion.

143.    As a direct and proximate result of BMW NA's breach of contract or common law warranty, Plaintiff and members of the Warranty Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## SEVENTH CLAIM FOR RELIEF
### (For Injunctive Relief, on Behalf of the Injunctive Relief Subclass)

144.    Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

145.    BMW AG designed, manufactured, produced, tested and inspected; BMW NA marketed, distributed, and sold; and BMW Manufacturing produced Class Vehicles containing material and dangerous defects as described herein.

146.    Based upon information and belief, BMW NA continues to market, distribute, and sell Class Vehicles containing material and dangerous defects and Defendants have done nothing to remove the Class Vehicles containing the defects described herein from the market and from the households of consumers.

147.    Based upon information and belief, BMW Manufacturing continues to assemble the Class Vehicles in accordance with designs from BMW AG.

148.    Although BMW NA issued service bulletins to its authorized

service technicians to perform certain repairs to minimize the impact of the defects (including relocating the electronic components from the lowest point in the trunk to a higher point in the trunk that would not subject the electronic components to damage caused by leaks and standing water through ordinary and expected use of the vehicles), BMW NA does not routinely enforce or follow this service bulletin. As a result members of the Injunctive Relief Subclass are substantially likely to suffer immediate further injury.

149.    The defects described herein poses a safety risk to consumers and members of the general public, because the placement of vital electronic components in the lowest portion of the Class Vehicles' trunks, where they are prone to damage and complete failure from any leaks (in particular, those leaks from the defective sunroof drains), results in dangerous driving conditions.

150.    Based upon information and belief, Defendants have taken no corrective action concerning the defects described herein, and has not issued any warnings or notices concerning the dangerous defects, nor issued a program, fund, or replacement program, notify consumers to re-locate the electronic components that sit in the lowest portion of Class Vehicles' trunks or notification program to redesign the electronic component compartment to prevent water intrusion or allow for improved water drainage.

151.    Plaintiff and Class members have suffered actual damage or injury or are in immediate risk of suffering actual damage or injury due to the Class Vehicles' defects.

152.    Defendants should be required to take corrective action to avoid the

safety risk the Class Vehicles pose, including:  issuing a nationwide program or fund to replace the defective component parts, re-locate the electronic components that sit in the lowest portion of Class Vehicles' trunks or redesign the electronic component compartment to prevent water intrusion or allow for improved water drainage; issuing warnings and/or notices to consumer and the Injunctive Relief Subclass members concerning the Class Vehicles' defects and safety issues; and, if Defendants have not already done so, immediately discontinue the sale of the Class Vehicles with defectively-placed electronic component parts that have not been repaired.

### EIGTH CLAIM FOR RELIEF
**(For Declaratory Relief, on Behalf of the Class)**

153.    Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

154.    There is an actual controversy between Defendants and Class members concerning the existence of defects in the Class Vehicles and whether the repair of such defects should be covered under the Class Vehicle's Warranty.

155.    Pursuant to 28 U.S.C. § 2201, this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

156.    As described herein, the Class Vehicles were designed or manufactured in such a way that makes them unsafe and susceptible to flooding or water intrusion.  Such water intrusion can and does lead to the catastrophic failure of electronic component parts in the trunk of the Class Vehicles.

157.    Accordingly, Plaintiffs and Class members seek a declaration that

the Class Vehicles have common defects in their design, manufacturing or materials and that any future repairs involving water damage to electronic equipment in the trunk of the vehicle as described herein should be covered under the Class Vehicles' warranty and any extended warranty sold to Class members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, pray for judgment against Defendants as follows:

A.      An Order certifying this action as a class action;

B.      An Order appointing Plaintiff as class representative of the Class and Subclasses, and appointing counsel undersigned to represent the Class and Subclasses;

C.      An Order awarding injunctive relief by requiring Defendants to issue corrective actions including notification and repair of the Class Vehicles, or the establishment of a fund or program to repair the Class Vehicles;

D.      Payment to the Class of all damages associated with the replacement of the defective products, in an amount to be proven at trial;

E.      Restitution as authorized by law;

F.      An award of attorneys' fees and costs, as provided by law and/or as would be reasonable from any recovery of monies recovered for or benefits bestowed on the class;

G.      Interest as provided by law, including but not limited to pre-judgment and post-judgment interest as provided by rule or statute; and

H.      Punitive damages as allowed by law and the proof presented in this case; and

I.      Such other and further relief as this Court may deem just, equitable, or proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated:  November 2, 2015.                    By:  /s/ Amy E. Keller
                                             Amy E. Keller


WEXLER WALLACE LLP
Edward A. Wallace
Amy E. Keller
eaw@wexlerwallace.com
aek@wexlerwallace.com
55 West Monroe Street, Suite 3300
Chicago, Illinois 60603
Telephone:      (312) 346-2222
Facsimile:      (312) 346-0022

KERSHAW, CUTTER & RATINOFF LLP
William A. Kershaw
Stuart C. Talley
Ian J. Barlow
wkershaw@kcrlegal.com
stalley@kcrlegal.com
ibarlow@kcrlegal.com
401 Watt Avenue
Sacramento, California 95864
Telephone:      (916) 448-9800
Facsimile:      (916) 669-4499

THE LAW OFFICES OF STEPHEN M. HARRIS, P.C.
Stephen M. Harris
stephen@smh-legal.com
6320 Canoga Avenue, Suite 1500
Woodland Hills, California 91367
Telephone:      (818) 924-3103
Facsimile:      (818) 924-3079

THE LAW OFFICES OF ROBERT L. STARR
Robert L. Starr
robert@starrlawmail.com
23277 Ventura Boulevard
Woodland Hills, California 91364
Telephone:      (818) 225-9040
Facsimile:      (818) 225-9042

THE LAW OFFICES OF JOSEPH R. SANTOLI
josephsantoli@aol.com
340 Devon Court
Ridgewood, New Jersey 07450
Telephone:      (201) 926-9200
Facsimile:      (201) 575-2184

*Attorneys for Plaintiff and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed using this Court's CM/ECF notification service, which sent notification of such filing to all counsel of record on November 2, 2015.

I further certify that this copy is being filed using this Court's CM/ECF notification service pursuant to a Notice of Deficiency received on November 3, 2015, in order to correct a clerical error which occurred when filing, and to correct the case caption to reflect that this document is being filed in the Southern District of New York.

/s/ Amy E. Keller
Amy E. Keller

45